Slip Op. 21-18

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **BORUSAN MANNESMANN BORU SANAYI VE TICARET A.Ş. AND BORUSAN MANNESMANN PIPE U.S. INC.,**<br><br>Plaintiffs,<br><br>v.<br><br>**UNITED STATES,**<br><br>Defendant,<br><br>and,<br><br>**WHEATLAND TUBE AND NUCOR TUBULAR PRODUCTS INC.,**<br><br>Defendant-Intervenors. | Before: Jane A. Restani, Judge<br><br>Court No. 20-00015 |

## OPINION

[Antidumping Duty Determination in Review of Order on Steel Pipe and Tube from the Republic of Turkey Remanded.]

Dated: February 17, 2021

Julie C. Mendoza and Mary S. Hodgins, Morris, Manning & Martin LLP, of Washington D.C. argued for Plaintiffs Borusan Mannesmann Boru Sanayi ve Ticaret A.Ş. and Borusan Mannesmann Pipe U.S. Inc. With them on the brief were Donald B. Cameron, Brady W. Mills, Edward J. Thomas, III, Eugene Degnan, Jordan L. Fleischer, Rudi W. Planert, Sabahat Chaudhary and William H. Barringer.

Robert R. Kiepura, Trial Attorney, Civil Division, U.S. Department of Justice, of Washington D.C., argued for the Defendant. With him on the brief were Ethan P. Davis, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Franklin E. White, Jr., Assistant Director. Of counsel on the brief was Rachel A. Bogdan, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Elizabeth J. Drake, Schagrin Associates, of Washington D.C. argued for Defendant-Intervenors Wheatland Tube Company and Nucor Tubular Products Inc. With her on the brief

were Roger B. Schagrin, Schagrin Associates, of Washington D.C. for Defendant-Intervenor Wheatland Tube Company and Alan H. Price, Robert E. DeFrancesco, III, Cynthia C. Galvez, and Theodore P. Brackemyre, Wiley Rein LLP, of Washington D.C. for Defendant-Intervenor Nucor Tubular Products Inc.

Restani, Judge: Before the court is a motion for judgment on the agency record pursuant to United States Court of International Trade ("USCIT") Rule 56.2, in an action challenging a final determination of the United States Department of Commerce ("Commerce"). The final determination at issue results from Commerce's findings during an administrative review of the antidumping ("AD") order covering circular welded carbon steel standard pipe and tube ("CWP") products from Turkey. Issues and Decision Memorandum for the Final Results of the 2017-2018 Administrative Review of the Antidumping Duty Order on Circular Welded Carbon Steel Standard Pipe and Tube from Turkey, A-489-501, POR 5/1/2017-4/30/2018 (Dep't Commerce Jan. 14, 2020) ("I & D Memo"). Plaintiffs Borusan Mannesmann Boru Sanayi ve Ticaret A.Ş. and Borusan Mannesmann Pipe U.S. Inc. (collectively, "Borusan") challenge the calculation of both sides of the basic comparison of home market sales with sales in the United States market. See 19 U.S.C. §§ 1677a, 1677b.

## BACKGROUND

On July 12, 2018, Commerce initiated the May 1, 2017 – April 30, 2018, administrative review of the AD Order covering CWP products from Turkey. Initiation of Antidumping and Countervailing Duty Administrative Reviews, 83 Fed. Reg. 32,270 (Dep't Commerce July 12, 2018) ("Initiation of Investigation"). On August 8, 2018, Commerce selected Borusan Mannesmann Boru Sanayi ve Ticaret A.Ş. and Toscelik Profil ve Sac Endustrisi A.S., as two mandatory respondents to be individually reviewed. See Commerce's Respondent Selection Memorandum, C.R. Doc. 3, P.R. Doc. 12 (Aug. 8, 2018). Commerce issued its Preliminary Results and accompanying Decision Memorandum on July 10, 2019. Decision Memorandum for

Preliminary Results of Antidumping Duty Administrative Review: Circular Welded Carbon Steel Standard Pipe and Tube Products from Turkey; 2017-2018, A-489-501, POR 5/1/2017-4/30/2018 (Dep't Commerce July 10, 2019) ("Prelim I & D Memo"). The Preliminary Results were published in the Federal Register on July 18, 2019. Circular Welded Carbon Steel Standard Pipe and Tube Products from Turkey: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2017-2018, 84 Fed. Reg. 34,345 (Dep't Commerce July 18, 2019) ("Preliminary Results"). Commerce issued the Final Results on January 22, 2020, resulting in a 9.99% margin for Borusan. Circular Welded Carbon Steel Standard Pipe and Tube Products From Turkey: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017-2018, 85 Fed. Reg. 3,616, 3,617 (Dep't Commerce Jan. 22, 2020) ("Final Results").

    **a. PMS determination and adjustment**

On January 29, 2019, Wheatland Tube ("Wheatland") filed a particular market situation ("PMS") allegation arguing that the cost of hot-rolled-coil ("HRC") is distorted and, because HRC is a component of CWP, the cost of production ("COP") of CWP in Turkey does not reflect the COP in the ordinary course of trade. Wheatland's Particular Market Situation Allegation at 4–5, P.R. Docs. 77-80 (Jan. 29, 2019). As a result, Wheatland requested that Commerce make an upward adjustment to Borusan's actual COP for CWP when conducting its sales-below-cost test for calculating normal value of CWP. Id. at 1, 9, 18. Normal value is based on home market sales or a substitute. 19 U.S.C. §1677b(a)(B)(i)–(ii). Here, home market sales were used. Prelim I & D Memo at 16.

In the Preliminary Results, Commerce determined that a PMS existed in Turkey that distorted the COP of CWP based on the factors alleged in Wheatland's PMS allegation. Prelim I & D Memo at 25. Thus, Commerce made an upward adjustment to Borusan's COP for purposes

of the sales-below-cost test set forth in 19 U.S.C. § 1677b(b). Id. at 19, 25. During the agency briefing and hearing period, Borusan argued that Commerce's adjustment to COP when conducting the sales-below-cost test violates the plain language of the statute and is not in accordance with law. Re-submission of Case Br. of Borusan Mannesmann Boru Sanayi ve Ticaret A.S. and Borusan Istikbal Ticaret at 2–8, C.R. Doc. 302, P.R. Doc. 277, (Sept. 24, 2019) ("Borusan Re-submission of Case Br."); Circular Welded Carbon Steel Pipes and Tubes from Turkey: Hearings Before Office IV for Antidumping and Countervailing Duty Operations Import Administration, International Trade Administration, Department of Commerce at 11–15, P.R. 286 (Oct. 23, 2019) ("Hearing Transcript"). Borusan also contended that there is no evidence of distortion in the Turkish HRC market and no basis for finding a PMS in Turkey. Borusan Re-submission of Case Br. at 8–19; Hearing Transcript at 15. In its final determination, Commerce continued to find that a PMS existed in Turkey and made an upward adjustment to Borusan's costs for purposes of the sales-below-cost test. I & D Memo at 5–7, 11–18, 22–27.

    b. **Treatment of Section 232 duties**

On March 8, 2018, the President exercised his authority under Section 232 of the Trade Expansion Act of 1967, as amended, and mandated the imposition of a global tariff of 25 percent on imports of steel articles from all countries, except Canada and Mexico. Proclamation No. 9705 of March 8, 2018, 83 Fed. Reg. 11,625, 11,626 (Mar. 15, 2018) ("Proclamation 9705"). The Section 232 duties went into effect on March 23, 2018. Id. at 11,627–28. The President subsequently altered aspects of Proclamation 9705.[1] The later Proclamations did not affect the

---

[1] See Proclamation No. 9711 of March 22, 2018, 83 Fed. Reg. 13,361 (Mar. 28, 2018); Proclamation No. 9740 of April 30, 2018, 83 Fed. Reg. 20,683 (May 7, 2018); Proclamation No. 9759 of May 31, 2018, 83 Fed. Reg. 25,857 (June 5, 2018); Proclamation No. 9772 of August 10, 2018, 83 Fed. Reg. 40,429 (Aug. 15, 2018) ("Proclamation 9772"); Proclamation No. 9886 of May 16, 2019, 84 Fed. Reg. 23,421 (May 21, 2019).

applicable duty rate in Turkey under Proclamation 9705 during the period of review ("POR").[2] See supra note 1. Under this Proclamation, imports of CWP produced by Borusan on and after March 23, 2018, were subject to the 25 percent *ad valorem* import duty imposed on imports from Turkey over and above any existing import duties that might be applicable to CWP. Proclamation 9705 83 Fed. Reg. at 11,627. According to its terms, Proclamation 9705 was issued in order to "enable domestic steel producers to use approximately 80 percent of existing domestic production capacity and thereby achieve long-term economic viability through increased production" and to "ensure that domestic producers can continue to supply all the steel necessary for critical industries and national defense." See id. at 11,625–26; see also 19 U.S.C. § 1862(d).[3]

---

[2] After the POR, the duty rate was temporarily doubled. See Proclamation 9772, 83 Fed. Reg. at 40,429–30. Temporary doubling is not at issue here.

[3] The statute describes the purpose of Section 232 duties as follows:

(d)  Domestic production for national defense; impact of foreign competition on economic welfare of domestic industries

For the purposes of this section, the Secretary and the President shall, in the light of the requirements of national security and without excluding other relevant factors, give consideration to domestic production needed for projected national defense requirements, the capacity of domestic industries to meet such requirements, existing and anticipated availabilities of the human resources, products, raw materials, and other supplies and services essential to the national defense, the requirements of growth of such industries and such supplies and services including the investment, exploration, and development necessary to assure such growth, and the importation of goods in terms of their quantities, availabilities, character, and use as those affect such industries and the capacity of the United States to meet national security requirements. In the administration of this section, the Secretary and the President shall further recognize the close relation of the economic welfare of the Nation to our national security, and shall take into consideration the impact of foreign competition on the economic welfare of individual domestic industries; and any substantial unemployment, decrease in revenues of government, loss of skills or investment, or other serious effects resulting from the displacement of any domestic products by excessive imports shall be considered, without excluding other factors, in determining whether such weakening of our internal economy may impair the national security.

19 U.S.C. § 1862(d).

In the Preliminary Results, Commerce treated the Section 232 duties paid by Borusan as "United States import duties" under 19 U.S.C. § 1677a(c)(2)(A) and therefore deducted the Section 232 duties on the United States price side of the dumping comparison from Borusan's export price ("EP") and constructed export price ("CEP"). Prelim I & D Memo at 11–15. Commerce also applied facts available to Borusan's CEP sales during the POR because Borusan did not maintain records linking CEP sales to specific entries on which Section 232 duties were paid. Id. at 15. Borusan argued that Commerce should not deduct Section 232 duties paid by Borusan from EP and CEP because Section 232 duties are special duties, not "United States import duties" within the meaning of the AD statute. Borusan Re-submission of Case Br. at 24–38; Hearing Transcript at 20–23. As to its CEP sales, in the alternative, Borusan asserted that Commerce's application of facts available was not justified because Borusan provided sufficient information explaining its inability to link its CEP sales to the U.S. entry dates and proposed an average inventory turnover methodology to determine which CEP sales were subject to Section 232 duties. Borusan Re-submission of Case Br. at 39–40; Hearing Transcript at 51–53. In the Final Results, Commerce continued to deduct the Section 232 duties as "United States import duties" pursuant to §1677a(c)(2)(A). I & D Memo at 30–33. Commerce determined that Section 232 duties are more akin to normal customs duties than to antidumping or countervailing ("AD/CV") duties,[4] codified as 19 U.S.C. §§ 1671, 1673, or Section 201 duties, codified as 19 U.S.C. § 2251, which are not deducted. Id. Commerce also determined that Borusan's proposed average inventory turnover methodology was insufficient for determining which CEP sales prices included Section 232 duties, and thus, the use of facts available was warranted. Id. at 37–38. Commerce then deducted from the CEP calculation Section 232 duties that were paid on an entry after March 23, 2018, the effective

---

[4] CV duties are countervailing duties intended to offset governmental subsidization. 19 U.S.C. § 1671.

date of the Section 232 duty imposed by Proclamation 9705. Id.

### c. Challenge to AD Order

On January 22, 2020, Borusan commenced the instant action against the United States pursuant to 19 U.S.C. §§ 1516a(a)(2)(A)(i)(I) and (a)(2)(B)(iii). Compl. ¶ 5, ECF No. 7 (Jan. 22, 2020). Borusan claims the AD Order is unsupported by substantial evidence or is otherwise contrary to law because Commerce incorrectly: (1) adjusted Borusan's COP for the purposes of the sales-below-cost test based on a finding of a PMS in Turkey, (2) determined that a PMS existed in Turkey that distorts the COP of CWP, (3) applied a flawed regression model when adjusting the COP for the PMS,[5] (4) treated Section 232 duties as normal U.S. customs duties and deducted them from Borusan's EP and CEP, and (5) applied facts available to Borusan's CEP inventory sales to deduct Section 232 duties from the CEP sales price. Compl. ¶¶ 35–42; Br. of Pls. Borusan in Supp. of their Mot. for J. on the Agency R. at 12–40, ECF No. 35-2 (June 4, 2020) ("Borusan Br.").

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2). The court sustains Commerce's results of an administrative review of an AD duty order unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]" 19 U.S.C. § 1516a(b)(1)(B)(i); Carpenter Tech. Corp. v. United States, 510 F.3d 1370, 1373 (Fed. Cir. 2007).

## DISCUSSION

**I.   Costs of Production may not be adjusted for a Particular Market Situation under 19 U.S.C. § 1677b(b), Sales at less than Cost of Production.**

### a. Statutory framework

---

[5] Issues two and three are mooted by the disposition of issue one and will not be addressed.

When Commerce determines that "sales of the foreign like product under consideration for the determination of normal value have been made at prices which represent less than the cost of production of that product," those sales may be disregarded in the determination of normal value if Commerce also determines that those sales were "made within an extended period of time in substantial quantities" and "were not at prices which permit recovery of all costs within a reasonable period of time[.]" 19 U.S.C. § 1677b(b)(1). When such sales are disregarded, "normal value shall be based on the remaining sales of the foreign like product in the ordinary course of trade." Id. Congress added the term PMS to the definition of "ordinary course of trade" in the Trade Preferences Extension Act ("TPEA"). See Trade Preferences Extension Act of 2015, Pub. L. No. 114-27, 129 Stat. 385 (2015); 19 U.S.C. § 1677(15). Commerce contends that the definition of PMS applies to COP under 19 U.S.C. § 1677b(b)(3). I & D Memo at 7; Def.'s Resp. to Pls.' Mot. for J. upon the Agency R. at 14–17, ECF No. 39 (Aug. 28, 2020) ("Gov. Br.").

### b. Commerce's decision to adjust Borusan's COP is contrary to law.

In recent opinions, the court has explained in detail that no adjustment for PMS is permitted when Commerce is using the sales-below-cost test to eliminate such sales from the pool of home market sales used for comparison to sales in the United States market. See Saha Thai Steel Pipe Pub. Co. v. United States, 476 F. Supp. 3d 1378, 1383, 1386 (CIT 2020); Dong-A Steel Co. v. United States, 475 F. Supp. 3d 1317, 1337–41 (CIT 2020); Borusan Mannesmann Boru Sanayi ve Ticaret A.Ş. v. United States, 426 F. Supp. 3d 1395, 1411–12 (CIT 2020); Husteel Co. v. United States, 426 F. Supp. 3d 1376, 1383–89 (CIT 2020); Saha Thai Steel Pipe Pub. Co. v. United States, 422 F. Supp. 3d 1363, 1368–71 (CIT 2019). Commerce argues that the TPEA generally expanded the meaning of "ordinary course of trade" to include all situations in which a PMS prevents a proper comparison of normal value with the EP or CEP. I & D Memo at 6–7; Gov. Br. at 14–15. Thus, it argues the definition carries through to normal value provisions

concerning sales below cost under 19 U.S.C. § 1677b(b)(3). See I & D Memo at 7; Gov. Br. at 16–17.

On numerous occasions, the court has held that the plain language and construction of §1677b authorizes PMS adjustments only when determining normal value using constructed value methodology under §1677b(e), not when determining whether to disregard sales below the cost of production under §1677b(b). See Saha Thai Steel Pipe Pub. Co., 476 F. Supp. 3d at 1383–86; Dong-A Steel Co., 475 F. Supp. 3d at 1337–41; Borusan, 426 F. Supp. 3d at 1411–12; Husteel Co., 426 F. Supp. 3d at 1383–89; Saha Thai Steel Pipe Pub. Co., 422 F. Supp. 3d at 1368–71. The TPEA expanded Commerce's discretion to calculate COP when calculating a constructed value. See 19 U.S.C. § 1677b(e). In the TPEA, Congress chose not to amend 19 U.S.C. § 1677b to apply such discretion to all subparts. Compare 19 U.S.C. § 1677b(e), with 19 U.S.C. § 1677b(b). Accordingly, Commerce's adjustments to Borusan's COP on account of a PMS for the purpose of the sales-below-cost test do not give effect to the unambiguously expressed intent of Congress and are therefore contrary to law.

Because a PMS adjustment is not permitted for the purposes of the sales-below-cost test, any claims relating to Commerce's PMS adjustment methodology and Commerce's determination that a PMS existed are now mooted.

> II.  **Section 232 duties may be treated as "United States import duties" to be deducted from EP and CEP in accordance with 19 U.S.C. § 1677a(c)(2)(A).**
>
>     a.  **Statutory framework and administrative history**

The adjustments to EP and CEP are set forth in section 772(c) of the Tariff Act of 1930, codified at 19 U.S.C. § 1677a(c). EP and CEP are to be reduced by "the amount, if any, included in such price, attributable to any additional costs, charges, or expenses, and United States import duties, which are incident to bringing the subject merchandise from the original place of shipment

in the exporting country to the place of delivery in the United States . . ." 19 U.S.C. § 1677a(c)(2)(A) (emphasis added).

When Congress has directly spoken to the precise question at issue, it ends the matter — "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842–43 (1984); Wheatland Tube Co. v. United States, 495 F.3d 1355, 1359 (Fed. Cir. 2007). When the statute is silent or ambiguous with respect to the specific issue, then the court must evaluate whether Commerce's interpretation "is based on a permissible construction of the statute." Chevron, 467 U.S. at 843. The inquiry is into "the reasonableness of Commerce's interpretation." NSK Ltd. v. United States, 26 CIT 650, 654, 217 F. Supp. 2d 1291, 1296 (2002).

Because the operable statute does not define "United States import duties," in Stainless Steel Wire Rod from the Republic of Korea: Final Results of Antidumping Duty Administrative Review, 69 Fed. Reg. 19,153 (Dep't Commerce Apr. 12, 2004) ("SSWR from Korea"), Commerce previously issued an interpretation of the phrase "United States import duties" with regard to the deductibility of Section 201 safeguard duties, 19 U.S.C. § 2251, utilizing formal notice and comment procedures. Id. at 19,157–61. Commerce concluded Section 201 duties should not be deducted as "import duties." Id. at 19,159–61. Commerce relied on the legislative history of the Antidumping Act of 1921 to conclude there is a distinction between "special dumping duties" and "normal customs duties" (also referred to as "United States import duties"). Id. at 19,159 (citing S. Rep. No. 67-16, at 4 (1921)) (emphasis added). Commerce cited the 1921 Senate Report to demonstrate that Congress intended that some duties implementing trade remedies, such as AD duties, are special duties to be distinguished from the normal duties that should be deducted from EP and CEP. Id.; I & D Memo at 30–31.

Whether Section 232 duties, unlike Section 201 duties, may be deducted from EP and CEP

in accordance with 19 U.S.C. § 1677a(c)(2)(A) as "United States import duties" is a question of first impression. Commerce's analysis with regard to the deductibility of Section 232 duties is based on its reasoning with regard to Section 201 duties in SSWR from Korea. See I & D Memo at 30–33. In SSWR from Korea, Commerce concluded that safeguard duties imposed under Section 201 are special duties because they are remedial and temporary in nature. SSWR from Korea, 69 Fed. Reg. at 19,159, 19,161. Commerce also concluded that to find otherwise and deduct Section 201 duties from EP and CEP would result in an inappropriate double remedy under the statute. Id. at 19,160. In upholding as reasonable Commerce's interpretation that Section 201 safeguard duties are not "United States import duties," the Federal Circuit clearly stated that "United States import duties" is an ambiguous phrase in the statute. Wheatland Tube, 495 F.3d at 1359–60.

Borusan argues that Commerce's determination to treat Section 232 duties differently—as "United States import duties"—from AD/CV duties and Section 201 duties is unreasonable because Section 232 duties are similarly remedial and, like Section 201 duties, temporary in nature. Borusan Br. at 20–25. Borusan contends that just as with AD/CV duties and Section 201 safeguard duties, deduction of Section 232 duties would impose a double remedy on Borusan's exports and is not permitted by the statutory scheme. Borusan Br. at 25–26. In response, the Government asserts that Commerce's determination that Section 232 duties are significantly different from AD/CV duties and Section 201 duties was reasonable and consistent with its prior statutory interpretation of the phrase "United States import duties" because Section 232 duties are not remedial or temporary in nature and deducting them from CEP and EP would not impose a double remedy in contravention of the statute. Gov. Br. at 32–39.

      **b. Commerce's treatment of AD/CV duties and Section 201 duties does not preclude a different treatment of Section 232 duties.**

To understand how Section 232 duties, which at first glance seem far removed from ordinary customs duties, could be deductible from EP and CEP, the court starts, as is ordinary, with the statute. The statute, 19 U.S.C. § 1677a(c)(2)(A), states price is to be reduced by "United States import duties." 19 U.S.C. § 1677a(c)(2)(A). It does not use the phrase "normal customs duties." See id.

The Antidumping Act of 1921 created antidumping duties, see Emergency Tariff Act of 1921, Pub. L. No. 67-10, §§ 201–202 (codified as amended at 19 U.S.C. § 1673), and as the Senate Report relied on by Commerce noted, such duties were "special duties," not the import duties that were to be deducted from price in the United States market. See SSWR from Korea, 69 Fed. Reg. 19,159 (citing S. Rep. No. 67-16, at 4 (1921)); see also Emergency Tariff Act of 1921 § 202. In 1921, Section 201 duties did not exist. They were created in 1974. See Trade Act of 1974, Pub. No. L. 93-618, §§ 201–203 (1975) (codified as amended at 19 U.S.C. § 2251). Section 232 duties came into existence in the 1950's[6] and achieved essentially their present form in 1962. See Trade Expansion Act of 1962, Pub. No. L. 87-794, § 232 (codified as amended at 19 U.S.C. § 1862). So, does the term "import duties" in the 1921 Act mean only the duties that existed in 1921?[7] Nothing in the 1921 Act or its successors resolves that question, but why would one assume the scope of "import duties" is immutable? The very general nature of the term suggests adjustment for

---

[6] See Trade Agreements Extension Act of 1954, Pub. L. No. 83-464, § 2, 68 Stat. 360; Trade Agreements Extension Act of 1955, Pub. L. No. 84-86, § 7, 69 Stat. 166; Trade Agreements Extension Act of 1958, Pub. L. No. 85-686, § 8, 72 Stat. 678, 678–79.

[7] There seems to be general agreement that it would make little sense to deduct the "special duties" that were being created by the 1921 Act (i.e. antidumping duties) in the price comparison that establishes them. See APEX Exports v. United States, 777 F.3d 1373, 1379–80 (Fed. Cir. 2015); Hoogovens Staal BV v. United States, 22 CIT 139, 145–46, 4 F. Supp. 2d 1213, 1220 (1998); see also Def-Intervenors' Mem. in Resp. to Pls.' Mot. for J. on the Agency R. at 13, ECF No. 38 (Aug. 28, 2020) ("Nucor Br."). The circularity is obvious.

whatever "import duties" exist at the time the comparison is made. As the appellate court concluded, the phrase "import duties" is ambiguous. Wheatland Tube, 495 F.3d at 1359–60. If the antidumping statute made clear that post-1921 duties are not "import duties," then presumably the phrase would not be ambiguous.

Next, the threshold question should not be, as the parties seem to propose, whether Section 201 duties and Section 232 duties are so similar that Commerce acts unreasonably if it does not give them identical treatment. See Borusan Br. at 20; Gov. Br. at 30–31; I & D Memo at 32–33. Rather, the question should be, what is the purpose of the deduction for "import duties" in the dumping margin calculation, and does reduction of price by Section 232 duties serve that purpose.

In conducting the comparison between home market sales and sales made in the United States market, the price paid on goods sold in the U.S. market is reduced by a number of items, including import duties, in an attempt to get back to an ex-factory price that is comparable to the price of goods in the home market. 19 U.S.C. § 1677a(c); see also S. Rep. No. 67-16, at 12 (1921); H.R. Rep. No. 67-1, at 23–24 (1921); H.R. Rep. No. 67-79, at 2–3 (1921). Obviously, there are no import duties on home market sales. Thus, the presumption might be that all import duties are to be deducted, except for antidumping duties that present the unique circularity issue. Nonetheless, Commerce found that Section 201 duties were not to be deducted under the price reduction statute, §1677a(c). SSWR from Korea, 69 Fed. Reg. at 19,159, 19,161. Thus, the next question is what is so unique about Section 201 duties that they are not deducted from the price paid even though they are duties on imports.

When called upon to decide whether Section 201 safeguard duties were deductible "import duties," Commerce considered three factors: (1) whether the duties are remedial, (2) whether they are temporary, and (3) whether deducting them from EP and CEP would result in an impermissible double remedy. The answer to all three factors was "yes." SSWR from Korea, 69 Fed. Reg. at

19,159–61. Commerce conducted a similar analysis for Section 232 duties and concluded to the contrary, that based on the same factors, Section 232 duties should be treated as "United States import duties." I & D Memo at 30–33; 2017-2018 Administrative Review of Circular Welded Carbon Steel Standard Pipe and Tube Products from Turkey: Section 232 Duties, A-489-501, POR 5/1/2017-4/30/2018 at 7–9 (Dep't Commerce July 10, 2019) ("Section 232 Memo"). We turn to each factor for which Commerce answered "no."

Commerce states that Section 232 duties are not akin to antidumping or Section 201 duties because Section 232 duties "are not focused on remedying injury to a domestic industry" but on threats to national security. I & D Memo at 31. Borusan contends that like Section 201 duties, Section 232 duties are remedial in nature because, despite the stated purpose of ensuring that imports do not threaten national security, the duties are imposed following specific investigations and determinations of the existence of injury or threat of injury to domestic industries. Borusan Br. at 20–23.

Even though there is a broader statutory purpose underlying the imposition of Section 232 duties, the purpose of Section 232 duties is also remedial in a broad sense. Subsection (d) of Section 232 is titled "Domestic production for national defense; impact of foreign competition on economic welfare of domestic industries"—demonstrating that Section 232 duties are not part of normal trade remedies, but rather are enacted in response to trade practices in specific instances in which the welfare of key domestic industries is impacted by foreign trade. 19 U.S.C. § 1862(d). Section 232 duties are to be imposed after special findings that consider "the impact of foreign competition on the economic welfare of individual domestic industries" in the light of "national security" concerns. Id.

Accordingly, Section 232 duties are remedial, not in the sense of AD/CV duties but more closely to the sense of remediation reflected in Section 201. Neither 232 nor 201 requires a finding

of an unfair trade practice. See id. §§ 1862(b), 2251(a). Their focus is on saving a United States industry; of course, there are differences. Section 201, but not Section 232, requires a finding of a particular level of injury or threat of injury. Compare id. § 2252(b), with id. § 1862(b). Further, Section 232 duties could be used to promote vital nascent industries, not just already established injured industries. In such a case, remediation would not be a primary goal. Accordingly, the court concludes that Commerce's reasoning based on lack of remedial purpose, while not the strongest, is not completely bereft of logic.

Similarly, and with respect to the second factor, Section 232 duties and Section 201 duties are both temporary in that no Congressional action is needed to end them. That is a clear difference from normal customs duties, which are enacted by Congress. Section 201 has time limits. 19 U.S.C. § 2253(e). Section 232 duties may be terminated any time the President believes their purpose has ended. See Proclamation 9705, 83 Fed. Reg. at 11,626; 19 U.S.C. § 1862; cf. Wheatland Tube, 495 F.3d at 1362 ("Normal customs duties, however, have no termination provision and are permanent unless modified by Congress."). The difference in how the duties are time limited does not make Section 232 significantly more permanent than Section 201. Thus, to the court, lack of permanence is not a viable reason to distinguish Section 201 duties from Section 232 duties.

The third factor cited by Commerce, impermissible double counting, bears greater consideration. There is a clear statutory interplay between Section 201 duties and antidumping duties, while Section 232 does not reveal any such coordination concerns. While it was not emphasized in the I & D Memo explaining Commerce's decision here, Commerce did mention the complimentary nature of Section 201 and the antidumping laws; and the absence of such interplay with respect to Section 232. I & D Memo at 33. Further, where statutorily mandated coordination existed, i.e., in the context of Section 201, see 19 U.S.C. § 2252(c)(5), Commerce analyzed it, see

SSWR from Korea, 69 Fed. Reg. at 19,160, and that analysis was cited in the I & D Memo applicable to this case, I &D Memo at 30–33.

As indicated, the International Trade Commission must make a particular injury determination before Section 201 safeguard duties may be imposed. 19 U.S.C. § 2252(b). Further, the imports must be a substantial cause of serious injury, or threat thereof. Id. In the course of making the Section 201 injury determination, if the Commission has reason to believe the surge in imports is attributable to dumping or actionable subsidization, it is to refer the matter to Commerce. 19 U.S.C. § 2252(c)(5); see also SSWR from Korea, 69 Fed. Reg. at 19,160. Action under the unfair trade laws rather than under Section 201 is preferred. SSWR at Korea, 69 Fed. Reg. at 19160 (citing S. Rep. No. 93-1298, at 123 (1974)); see also Nucor Br. at 18–19. Moreover, in setting the level of surge relief, the President is to consider relief already provided by antidumping and countervailing duty laws. See Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103-316, vol. 1, at 964 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4267. Thus, the ordinary internationally accepted remedies for unfair trade practices are to be considered when setting Section 201 duties, implying that Section 201 duties are, in fact, related to and complimentary to antidumping duties. Id.; S. Rep. No. 93-1298, at 122–23 (1974); see also Nucor Br. at 18–19. There is no such requirement of complimentary treatment with normal unfair trade laws in Section 232. None of this interplay is discussed in the 232 statute, see 19 U.S.C. § 1862, or its legislative history, as Commerce noted. See I & D Memo at 32–33. Instead, antidumping duties are simply to continue after the President imposes Section 232 duties. See Proclamation 9705, 83 Fed. Reg. at 11,627 (stating that "all steel articles imports specified . . . shall be subject to an additional 25 percent ad valorem rate of duty . . . . in addition to any other duties, fees, exactions, and charges applicable to such imported steel articles"); see also I & D Memo at 33. Commerce concluded that antidumping duties and Section 232 duties are "separate and distinct,"

with no overlap in providing remedies under each. I & D Memo at 32.

The AD statute does not expressly differentiate among import duties. While Section 232 duties are "special" in some sense, in that they are temporary, they are still import duties. Given that the statutory term at issue is "import duties" and it appears broad enough to include all import duties except antidumping duties, the court likely would have had little pause in saying that Commerce did not err in treating Section 232 duties as it did here, before the Section 201 decision in Wheatland Tube, 495 F.3d at 1365–66. The final question remaining then is whether the reasoning provided by Commerce differentiating its treatment of Section 232 and Section 201 duties is so lacking in merit that the court must say it is arbitrary. The court does not so state. This is a reasonable decision based on crucial differences between Sections 201 and 232, namely that Section 201 duties are more akin to antidumping duties and that there is an interplay between antidumping duties and Section 201 duties, which is not present with Section 232 duties.[8] Accordingly, the court sustains Commerce's decision that the CEP and EP may be reduced by Section 232 duties paid.

### III. The Section 232 duty reduction to CEP was not properly considered.

The final issue before the court is whether CEP should be calculated without reduction for Section 232 duties based on the facts of record.[9] Although Borusan, the importer of record during the POR, "did not keep records linking its CEP sales to actual entry dates," Commerce reasonably concluded that Borusan did not have adequate notice that it must keep records to match Section

---

[8] The court is not persuaded that the placement of Section 232 duties within the Harmonized Tariff Schedule of the United States has an effect. See Proclamation 9705 83 Fed. Reg. at 11,629; Harmonized Tariff Schedule of the United States ("HTSUS") subheading 9903.80.01 (2020); see also Borusan Br. at 28–29.

[9] There is no dispute that certain EP sales prices included Section 232 duties. Prelim I &D Memo at 13.

232 duties paid on entry to the sales of its affiliate. I & D Memo at 37–38. So, Commerce applied what it implies is a neutral facts available approach to calculate the CEP Section 232 duty deduction. See id.; 19 U.S.C. § 1677e(a).

Borusan made clear to Commerce that there was one 7 MT shipment on which Section 232 duties were paid when the shipment entered the United States a very few days before the end of the POR. Borusan Re-submission of Case Br. at 39–40; Borusan's Response to Commerce's Third Supplemental Section C Questionnaire, at 2–3, Exhibit C-29, C.R. 221, P.R. 188 (May 20, 2019) ("Questionnaire Response"). The average inventory period for these types of goods is the better part of a year. Questionnaire Response at 3. While Borusan admitted it was theoretically possible that the late shipment could be sold out of inventory in a few days, it was highly unlikely. Questionnaire Response at 3. It is quite difficult to see how a sales contract could be negotiated that would have included the duties so recently paid.

It is true as the Government asserts in its brief, Gov. Br. at 43–44, that Borusan cannot conclusively demonstrate, at least at this stage of the proceedings, that it made no such sale. Questionnaire Response at 3, Exhibit C-29.[10] But applying a standard requiring conclusive proof, see I & D Memo at 37–38, is the equivalent of drawing an adverse inference with respect to the facts selected, not the neutral choice required. See 19 U.S.C. § 1677m(e). Further, substantial evidence must underlie any choice, even if the evidence is based on facts available. Substantial evidence "must do more than create a suspicion of the existence of the fact to be established." NLRB v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300 (1939). Commerce has not cited substantial evidence that the CEP sale included Section 232 duties, nor has it explained how

---

[10] The court accepts that Borusan did not sufficiently raise with Commerce an argument that an examination of sales data would show conclusively that the specific product composing the 7 MT shipment on which Section 232 duties were paid was not actually sold during the POR. Borusan's counsel conceded lack of exhaustion on this narrow point at oral argument.

it arrived at such a conclusion using neutral facts available.

On remand, Commerce must reweigh all of the evidence, including any relevant sales data, with respect to the reduction of CEP by Section 232 duties paid, applying normal decision-making tools without an adverse inference.

## CONCLUSION

This matter is remanded to eliminate any adjustment to COP based on a PMS in the sales-below-cost test and to weigh, in an evenhanded manner, the evidence of record applicable to reduction of CEP by Section 232 duties paid. The remand determination shall be issued within 60 days hereof. Comments may be filed 30 days thereafter and any response 15 days thereafter.

    /s/Jane A. Restani    
Jane A. Restani, Judge

Dated: February 17, 2021
       New York, New York